J-S47044-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ELIJAH EZEKIAL CLARK-BREAM, | : | |
| | : | |
| Appellant | : | No. 66 MDA 2019 |

Appeal from the Judgment of Sentence Entered December 19, 2018
in the Court of Common Pleas of York County
Criminal Division at No(s): CP-67-CR-0007288-2017

BEFORE: DUBOW, J., NICHOLS, J., and MUSMANNO, J.

MEMORANDUM BY MUSMANNO, J.:     **FILED: OCTOBER 18, 2019**

Elijah Ezekial Clark-Bream ("Clark-Bream") appeals from the judgment

of sentence entered following his conviction of simple assault and

harassment.[1]  We affirm.

In its Opinion, the trial court summarized the relevant factual history as

follows:

> In September 2017, Ciarra Robinson [("Robinson")] was
> living with her friend[,] Nicole Wolfe [("Wolfe"),] in Hanover[,]
> Pennsylvania.  Both women were friends with [Clark-Bream[2]].  On
> September 23, 2017, [Wolfe], [Clark-Bream], and their friends,
> Allesia Cains [("Cains")], Hannah Small [("Small")], and Nicole
> Kipps [("Kipps")] went out to Field of Screams, a Halloween
> attraction, in Lancaster.
>
> Upon their return [to the Wolfe/Robinson apartment], they
> concealed the presence of [Clark-Bream].  [Robinson] first noticed

---

[1] *See* 18 Pa.C.S.A. §§ 2701, 2709.

[2] Robinson testified at trial that she did not get along with Clark-Bream.

[Clark-Bream] in the apartment[,] as she was leaving through the main entrance. [Robinson] testified that upon seeing [Clark-Bream,] she asked what he was doing there and told him to leave. [Clark-Bream] was arguing with her. Both [Robinson] and [Clark-Bream] were swearing. [Robinson] then said, "[w]here is my knife?" The knife was never found and [Robinson] did not have it when the ensuing altercation with [Clark-Bream] occurred.[FN1]

---

[FN1] When asked whether [Robinson] had a knife in her possession, [Clark-Bream] testified that she did not have a knife. Trial Transcript, 246:24.

---

When she was unable to locate her knife, [Robinson] picked up [] Kipps's car keys and popcorn to take them out of the house. [] Kipps was [Clark-Bream's] girlfriend at the time[, and mother of his child]. While she was trying to take the popcorn and keys out of the house[, Clark-Bream] told her[,] "don't touch my baby mom's shit." There was testimony that [Robinson] did throw the popcorn and keys at [Clark-Bream].[FN2] When [Robinson] did not listen[, Clark-Bream] came up behind her and attacked her.

---

[FN2] Trial Transcript, 22:8.

---

[Clark-Bream] punched [Robinson] in the face and kicked her. [Robinson] tried to crouch down to protect herself from the attack. [Clark-Bream] then stood over her and continued to kick her. Eventually, [] Wolfe was able to pull [Clark-Bream] off of [Robinson]. Ultimately[, Robinson] ended up with a broken nose and bruising on her face and legs.

[Clark-Bream] and [] Kipps left the apartment. [Robinson] then called the police. Officer Matthew Waltersdorff [("Officer Waltersdorff"),] of the Hanover Borough Police Department[,] responded to the call. When Officer Waltersdorff arrived[,] [Robinson's] nose was actively bleeding and she was already developing bruises….

Trial Court Opinion, 4/2/19, at 1-3 (two footnotes in original, one footnote added).

A jury subsequently convicted Clark-Bream of simple assault, and the trial court found Clark-Bream guilty of harassment. For his conviction of simple assault, the trial court sentenced Clark-Bream to a prison term of one to two years. The trial court imposed no further penalty for Clark-Bream's conviction of harassment. Thereafter, Clark-Bream filed the instant timely appeal, followed by a court-ordered Pa.R.A.P. 1925(b) Concise Statement of matters complained of on appeal.

Clark-Bream presents the following claim for our review: "[Whether] the trial court erred in instructing the jury on self[-]defense[?]" Brief for Appellant at 4. Specifically, Clark-Bream challenges as unwarranted the trial court's jury instruction on self-defense, when confronted with **non**-deadly force. *Id.* at 14. According to Clark-Bream, "the appropriate instruction under the circumstances was for a complete deadly force instruction, including an instruction on serious bodily injury." *Id.* Clark-Bream argues that the jury had to consider two or more competing versions of the incident. *Id.* at 19. Clark-Bream directs our attention to testimony that Robinson was searching for her knife, and argues that he was not certain whether Robinson had found her knife when she confronted him. *Id.* at 19-20. Clark-Bream contends that "[a] jury instruction without the deadly force and serious bodily injury

components does not provide the jury with the ability to fully consider the evidence presented." *Id.* at 20.

In reviewing a jury charge,

we determine whether the trial court committed a clear abuse of discretion or an error of law which controlled the outcome of the case. We must view the charge as a whole; the trial court is free to use its own form of expression in creating the charge. A trial court has broad discretion in phrasing its instructions, and may choose its own wording so long as the law is clearly, adequately, and accurately presented to the jury for its consideration. Moreover, it is well-settled that the trial court has wide discretion in fashioning jury instructions. The trial court is not required to give every charge that is requested by the parties[,] and its refusal to give a requested charge does not require reversal unless the appellant was prejudiced by that refusal.

*Commonwealth v. Williams*, 176 A.3d 298, 314 (Pa. Super. 2017) (internal citations and quotation marks omitted).

Defendants are generally entitled to jury instructions they request, so long as they are supported by the evidence. *Commonwealth v. Hairston*, 84 A.3d 657, 668 (Pa. 2014). "[T]he reason for this rule is that instructing the jury on legal principles that cannot rationally be applied to the facts presented at trial may confuse them and place obstacles in the path of a just verdict." *Id.* A defendant cannot claim entitlement to an instruction that has no basis in the evidence presented during trial. *Id.*

Under the Crimes Code, self-defense falls under the defense of justification, which is a complete defense to criminal culpability. 18 Pa.C.S.A. § 502. Section 505, which governs self-defense, provides as follows:

> **(a) Use of force justifiable for protection of the person.—**
> The use of force upon or toward another person is justifiable when the actor believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion.

18 Pa.C.S.A. § 505(a). A self-defense charge must be given upon request if there is evidence presented that the defendant acted in self-defense. *Commonwealth v. Gonzales*, 483 A.2d 902, 903 (Pa. Super. 1984).

Clark-Bream takes issue with the trial court's instruction on self-defense, when confronted with **non**-deadly force. Brief for Appellant at 15. Clark-Bream asserts that an instruction regarding deadly force was required.[3]

*Id.*

Here, the trial court addressed Clark-Bream's claim as follows:

> [Clark-Bream] argues that there was evidence presented which indicated [that Robinson] confronted [Clark-Bream] while armed[,] and that [Clark-Bream's] responsive use of force was to deadly force. Deadly force is defined as "force which, under the circumstances in which it is used, is readily capable of causing death or serious bodily injury. [18 Pa.C.S.A. § 501]. [The court is] not sure what evidence [Clark-Bream] is referring to. [Clark-Bream] himself stated that he did not see [Robinson] wielding a

---

[3] For such an instruction to be appropriate, three factors must have existed:

> First, the actor must have reasonably believed himself to be in imminent danger of death or serious bodily harm, and that it was necessary to use deadly force against the victim to prevent such harm. Second, the actor must have been free from fault in provoking or continuing the difficulty which resulted in the slaying. Third, the actor must have violated no duty to retreat.

*Commonwealth v. Maione*, 554 A.2d 939, 944 (Pa. Super. 1989).

knife on the night this altercation occurred. The only thing [Robinson] [] was armed with was a bag of popcorn and a set of keys, neither of which are readily capable of causing death or serious bodily injury.

Trial Court Opinion, 4/2/19, at 6 (footnote omitted). Our review of the record confirms the trial court's assessment.

Robinson testified at trial that, at the time of the incident, she lived in a two-bedroom apartment located at 20 York Street, in Hanover, Pennsylvania. N.T., 11/14-16/18, at 90-91. Robinson stated that, for less than one month, she shared the apartment with Wolfe. *Id.* at 91. Robinson testified that she has known Clark-Bream since about 2010. *Id.* at 93. At around midnight, on September 24, 2017, Wolfe, Small and Kipps returned to the apartment, walked through the apartment to the kitchen, and allowed Clark-Bream to enter the apartment through the kitchen door. *Id.* at 96-97. Robinson testified that she did not get along with Clark-Bream. *Id.* at 97. Robinson told Clark-Bream to leave the apartment. *Id.* at 98. Rather than leaving the apartment, Clark-Bream argued with Robinson, using foul language, for approximately five minutes. *Id.* During the argument, Robinson began yelling, "where [i]s my knife[?]" *Id.* at 100. At the time, Clark-Bream was seated on the couch with Kipps, Wolfe and Small. *Id.* at 99. Cains would not give Robinson her knife. *Id.* at 100. Robinson specifically testified that although she had asked for her knife, she did not leave the kitchen. *Id.* at 123.

Robinson further testified that Kipps's popcorn and keys were on a chair near the living room entrance. *Id.* at 102. Robinson explained that she intended to remove Kipps's keys and popcorn from the apartment, because Kipps was Clark-Bream's girlfriend. *Id.* at 100. Robinson picked up Kipps's keys and popcorn, "and I was taking them out of the front door[,] and that's when it happened." *Id.* Robinson testified that Clark-Bream "attacked me from behind and started beating me up. He punched me in my face. He started kicking me and threw me to the ground." *Id.* at 100-01. According to Robinson, Clark-Bream "just got on top and started kicking me …. I couldn't fight back. And then[,] … Wolfe was trying to get him off of me while I was on the ground and he was kicking me." *Id.* at 103.

Clark-Bream countered Robinson's account, testifying that, when Robinson saw him in the apartment, she began yelling, "Where the fuck is my knife?" and "I am going to stab this nigga." *Id.* at 218-19. Clark-Bream admitted that he was not scared, but was "a little bit worried at that point." *Id.* at 219. Clark-Bream stated that as Robinson asked for her knife, she went into her bedroom for approximately three minutes. *Id.* at 219-20. At that time, Clark-Bream informed Wolfe that, "if [Robinson] comes out with a knife, like I don't know what the hell—what is going to happen." *Id.* at 221. As Robinson came out of her bedroom, Clark-Bream testified, she continued to yell "where is my knife[?]" *Id.* at 222. Robinson walked into the kitchen and

paced, agitated. *Id.* Clark-Bream expressly acknowledged that, after leaving the bedroom, **Robinson still was looking for her knife**. *Id.*

Clark-Bream stated that Robinson walked from the kitchen into the living room. *Id.* at 222-23. According to Clark-Bream, Robinson then grabbed Kipps's bag of popcorn and began throwing it toward the entrance to the apartment. *Id.* at 223. Clark-Bream posited, "I think her intention was kind of throw it out hoping that … [I would] get up and go towards the entrance door." *Id.* at 222-23. However, Clark-Bream also stated that Robinson was standing in the doorway of the living room and the kitchen when she threw the popcorn. *Id.* at 224. According to Clark-Bream's testimony, as Robinson threw the popcorn, she screamed at Clark-Bream to get out. *Id.*

Clark-Bream further testified that

whenever I stood up—at that point because [Robinson] stood in front of my face and I didn't know whether she found a knife or not, I didn't [*sic*] what she was going to do when I stood up. And when I looked up, she was [saying to] get the fuck out, get the fuck out[,] and got right in my face.

So, as she is in my face, all I can remember saying was, I was like, [Robinson,] just chill. Stop playing with me. I am not trying to do this with you right now. And at that point, she goes, fuck you and pushed me in the chest. When she pushed me in my chest, … I froze for a second. And I didn't react immediately. Initially.

But immediately after she pushed me, I said like approximately .5 seconds later, that's when she started grabbing my shirt and that's when it took off and that's what made me go off.

…

… [A]fter [Robinson] grabbed me, … I didn't really punch her necessarily, but like the hand I [*sic*] hit her in the face.  And she kind of like stumbled back and when [] she stumbled – it wasn't like a fall stumble, it was like a step back and, you know, kind of like preparing yourself like – I didn't hit her.

  And at that point she … got down on the ground and when she got down on the ground, move [*sic*], move out of my way. She started trying to block the doorway and like acting crazy.  I don't know her intentions were to block the doorway to keep me there.  She crouched down in the doorway and started flailing her arms and acting crazy and bawl[ed] like a baby fit [*sic*].

*Id.* at 225-28.  Clark-Bream also stated the following:

I remember hitting [Robinson] that one time and she was like away.  And I remember grabbing her by the shirt and dragging her out of the doorway.  After I retrieved [] Kipps and told [Wolfe that] we were leaving and I went toward the door and [Robinson] was still inside the doorway.  At this point[,] she was blocking the door.  [Clark-Bream stated that as he was leaving, he] moved her.

*Id.* at 227-28.

In his testimony, Clark-Bream testified that he was aware that Robinson owned a knife, but conceded that he was not afraid when Robinson asked for her knife.  *Id.* at 238-39.  Further, Clark-Bream testified that when Robinson came out of her bedroom, he did not see her with a knife.  *Id.* at 240.  Clark-Bream described the purported acts of "violence" committed against him, by Robinson, as a "push off," and a "grab."  *Id.* at 246.

Under the circumstances, we discern no abuse of discretion by the trial court in refusing to issue a deadly force self-defense instruction.  There is no evidence that would support such an instruction, given Clark-Bream's testimony that Robinson had continued to ask for her knife after emerging

from her bedroom; Clark-Bream never saw Robinson with a knife; and Robinson had used only her hands to grab and push Clark-Bream. Accordingly, we cannot grant Clark-Bream relief on this claim.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/18/2019